UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

CRAIG A. KIMMEL,                    :
                                    :
            Plaintiff               :      No. 4:09-CV-44
                                    :
        vs.                         :      (Complaint Filed 1/9/09)
                                    :
MICHAEL J. ASTRUE,                  :
COMMISSIONER OF SOCIAL              :      (Judge Muir)
SECURITY,                           :
                                    :
            Defendant               :

**ORDER**
June 17, 2009

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Craig A. Kimmel's applications for social
security disability insurance benefits (DIB) and supplemental
security income benefits (SSI).  For the reasons set forth below
we will affirm the decision of the Commissioner.

Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It is
undisputed that Kimmel met the insured status requirements of the
Social Security Act through March 31, 2007.  Tr. 68, 163 and 176.[1]

_____

1.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant as part of his Answer on March 20,
                                              (continued...)

In order to establish entitlement to disability insurance benefits Kimmel was required to establish that he suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990). Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind and disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

On January 31, 2007, Kimmel protectively[2] filed applications for disability insurance benefits and supplemental security income benefits. Tr. 152–159, 160–162 and 176.[3] Kimmel, who was born on October 15, 1971[4] claims that he became disabled on June 7, 2006, because of seizure and anxiety related

---

1. (...continued)
2009.

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. Some documents indicate that the filing date for the DIB and SSI applications was January 30, 2007. Tr. 68 and 122–123. Also, the application for SSI benefits is dated March 8, 2007.

4. Kimmel is presently 37 years old and considered a "younger individual" under the Social Security regulations. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

disorders.  Tr. 128 and 198.  He further stated in documents filed with the Social Security Administration as follows: "The medications I am required to take make me very drowsy and I cannot drive or work while taking them." Tr. 198.  Kimmel completed the 12th grade, and has past relevant work experience as a laborer, forklift operator, and security guard.  Tr. 73, 117, 203 and 206. At the time of the onset of his alleged disability Kimmel was not working. Tr. 208.  In documents filed with the Social Security Administration Kimmel stated that he worked as a forklift operator through March of 2006.  Tr. 208.  Social Security earning records reveal that in 2002, Kimmel earned $11,587.64, $2088.87 in 2004 and $4583.16 in 2005. No earnings are reported for 2001, 2003 and 2006.  Tr. 164.  The laborer positions were obtained through temporary employment agencies and are considered unskilled, light work; the security guard position is considered light work; and the forklift operator position is considered medium, semiskilled work. Tr. 116–118.[5]

---

5. The terms sedentary, light and medium work are defined in the Social Security regulations as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(continued...)

Kimmel's claims were initially denied by the Social Security Administration on April 24, 2007. Tr. 124–132. On May 1, 2007, Kimmel requested a hearing before an administrative law judge. Tr. 133. On July 23, 2008, a hearing was held before an administrative law judge. Tr. 86–121. On September 17, 2008, the administrative law judge issued a decision denying Kimmel's applications for benefits. Tr. 68–74. On September 29, 2008, Kimmel filed an appeal of the administrative law judge's decision to the Appeals Council of the Social Security Administration. Tr. 62–63. On December 10, 2008, the Appeals Council concluded that there was no basis upon which to grant Kimmel's request for

---

5.    (...continued)
            (b) *Light work*.  Light work involves lifting no more
            than 20 pounds at a time with frequent lifting or
            carrying of objects weighing up to 10 pounds.  Even
            though the weight lifted may be very little, a job is
            in this category when it requires a good deal of
            walking or standing, or when it involves sitting most
            of the time with some pushing and pulling of arm or leg
            controls.  To be considered capable of performing a
            full or wide range of light work, you must have the
            ability to do substantially all of these activities.
            If someone can do light work, we determine that he or
            she can also do sedentary work, unless there are
            additional limiting factors such as loss of fine
            dexterity or inability to sit for long periods of time.

            (c) *Medium work*.  Medium work involves lifting no more
            than 50 pounds at a time with frequent lifting or
            carrying of objects weighing up to 25 pounds.  If
            someone can do medium work, we determine that he or she
            can do sedentary and light work.

20 C.F.R. §§ 404.1567 and 416.967.

review.  Tr. 1-3.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On January 9, 2009, Kimmel filed a complaint in this court requesting that we reverse the decision of the Commissioner denying him disability insurance and supplemental security income benefits.  On the same day the Clerk of Court assigned responsibility for this case to the undersigned for disposition.

The Commissioner filed an answer to the complaint and a copy of the administrative record on March 20, 2009.  Kimmel filed his brief on April 17, 2009, and the Commissioner filed his brief on May 26, 2009.  The appeal[6] became ripe for disposition on May 27, 2009, when Kimmel filed a reply brief.

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

---

6.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative

agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all
the other evidence in the record," Cotter, 642 F.2d at 706, and
"must take into account whatever in the record fairly detracts
from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S.
474, 488 (1971). A single piece of evidence is not substantial
evidence if the Commissioner ignores countervailing evidence or
fails to resolve a conflict created by the evidence. Mason, 994
F.2d at 1064. The Commissioner must indicate which evidence was
accepted, which evidence was rejected, and the reasons for
rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642
F.2d at 706-707. Therefore, a court reviewing the decision of the
Commissioner must scrutinize the record as a whole. Smith v.
Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v.
Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner
adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131
(2d Cir. 2000)("The ALJ has an obligation to develop the record in
light of the non-adversarial nature of benefits proceedings,
regardless of whether the claimant is represented by counsel.");
Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction
v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari,
270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433.
437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120

S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). If the record is not adequately developed, remand for further proceedings is appropriate. Id.

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in

8

substantial gainful activity,[7] (2) has an impairment that is
severe or a combination of impairments that is severe,[8] (3) has an
impairment or combination of impairments that meets or equals the
requirements of a listed impairment,[9] (4) has the residual
functional capacity to return to his or her past work and (5) if
not, whether he or she can perform other work in the national
economy. Id. As part of step four the administrative law judge
must determine the claimant's residual functional capacity. Id.[10]

Residual functional capacity is the individual's maximum
remaining ability to do sustained work activities in an ordinary

---

7. If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit." 20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

8. The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limit the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two. Id. If a claimant
has any severe impairments, the evaluation process continues. 20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process. 20 C.F.R. §§ 404. 1523, 404.1545(a)(2), 416.923 and
416.945(a)(2).

9. If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If not, the sequential evaluation process
proceeds to the next step.

10. If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

work setting on a regular and continuing basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  The residual functional capacity assessment must include a discussion of the individual's abilities.  <u>Id</u>; 20 C.F.R. §§ 404.1545 and 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

In this case the administrative law judge at step one found that Kimmel had not engaged in any substantial gainful activity since June 7, 2006, the alleged onset date of Kimmel's disability set forth in his applications. Tr. 70.

At step two, the administrative law judge found that Kimmel suffers from the following severe impairment: seizure disorder.  Tr. 70.  The administrative law judge further found that Kimmel suffered from anxiety and depression but that those impairments were nonsevere.  Tr. 70.

At step three the administrative law judge found that Kimmel's impairments did not individually or in combination meet or equal a listed impairment.  Tr. 71.  In making this determination, the administrative law judge focused on Listings 11.02 (Epilepsy - convulsive epilepsy) and 11.03 (Epilepsy - nonconvulsive). As will be discussed *infra* Kimmel contends he meets listing 11.02.

During the hearing on July 23, 2008, Kimmel admitted that he had not had a seizure for six months, that he was taking

his prescribed medications and that he had not consumed alcohol since his last birthday (October 15, 2007). Tr. 90–91 and 104. After hearing testimony from a medical doctor and a psychologist, the administrative law judge took testimony from a vocational expert to determine whether or not jobs exist in the economy for an individual with the education, work background, and physical and mental limitations such as Kimmel has. Specifically, the administrative law judge asked the vocational expert to consider a hypothetical individual who could not climb ladders, and should avoid environments with blinking lights, elevated heights, and noise; and who would require a low key, low stress job at the light to sedentary exertional levels, and who would need to avoid stress associated with public relations. Tr. 118.

In response to that hypothetical question, the vocational expert stated that the individual could perform sedentary work as an assembler, packager and inspector. Tr. 118–119.

In addressing step four of the sequential evaluation process in his decision, the administrative law judge found that Kimmel could not perform his past relevant work but that he had the residual functional capacity to perform sedentary work with the limitations noted above.

At step five of the sequential evaluation process, the administrative law judge concluded that Kimmel was not disabled because he could perform the jobs of assembler, packager, and

inspector identified by the vocational expert and that there were significant numbers of such jobs in the regional and national economies.   Tr. 73-74.

        The administrative record in this case is 351 pages in length, consisting, inter alia, of work history and medical records. Tr. 13-52, 164-172, 197-200, 208-215, and 241-321.   The administrative law judge did an excellent job of reviewing Kimmel's work history and medical records in his decision.   Tr. 70-74.   In this order we will only comment on the medical evidence that is relevant to our disposition of this case.

         As stated earlier in this order Kimmel contends that he became disabled on June 7, 2006.   On that date Kimmel paid a visit to the emergency department of the Good Samaritan Regional Medical Center, Pottsville, Pennsylvania, and was admitted to that facility.   Tr. 247.   A report of that visit prepared by the attending physician, James W. Fitzpatrick, D.O., states in pertinent part as follows:

> Mr. Kimmel is a 34-year old male with a history of
> seizure disorder. He was not taking medication because
> of his insurance problem and he is also a chronic
> alcohol abuser.  The patient presented to the E.R. with
> a seizure episode that started last night.  According to
> the patient and his wife the patient was under a lot of
> stress lately and last night the patient was drinking
> heavily and then he went to his ex-wife's house and he
> had an argument.  After he left he started having a
> seizure.  He had a total of four seizure episodes and
> he was brought into the E.R. after his last seizure
> episode.  The patient had one witnessed seizure episode
> in the E.R.  According to his wife the patient has been
> seizure free for the last one year and he is not taking
> any medication for this last one year because of his
> medical insurance.  The patient has just been released

from prison about six months. . . . Upon arrival in the
E.R. the patient had one seizure episode and after he
received IV fluid and Cerebyx his seizure subsided.

PAST MEDICAL HISTORY: Includes seizure disorder.

SOCIAL HISTORY: He smokes two packs of cigarettes per
day and he is drinking alcohol on a daily basis. . . .

PHYSICAL EXAMINATION: On examination this is a young
man who is not in acute distress.  He is drowsy but
arousable. . . .

LABORATORY DATA: Alcohol level is 345. . . .[11]

IMPRESSION:

1.  Unresponsiveness with seizure episode.
2.  Alcohol intoxication.
3.  Hypokalemia.[12]

Tr. 247–248.

Dr. Fitzpatrick's physical examination of Kimmel further
revealed that he had no signs of cranial nerve deficit, tremor,
pathological reflex, or focal neurological deficits.  Tr. 247.  A
CT scan of the head showed no acute infarction or bleeding. Tr.
248.

On June 7, 2006, John B. Chawluk, M.D. conducted a
consultative neurological evaluation of Kimmel.  Tr. 249–250.

11.  A blood alcohol laboratory report contained within the
administrative record reveals that Kimmel's blood alcohol level
was 345.60 mg/dL. Tr. 254. The legal limit in Pennsylvania is
.08% (80 mg/dL) for intoxication.

12.  Hypokalemia is where the concentration of potassium in the
blood is low. http://www.nlm.nih.gov/medlineplus/ency/article
/000479.htm (visited June 16, 2009). The laboratory report
contained within the administrative record reveals that the
reference range for potassium is 3.5 to 5.1 MMOL/L and Kimmel's
potasium level was 3.4 MMOL/L at 0245 hours and 3.9 MMOL/L at
0835 hours on June 7, 2006.  Tr. 252.

Kimmel was fully oriented and followed commands well. Tr. 249. Visual fields, facial movements, motor strength, and reflexes were all essentially normal. Tr. 249. Dr. Chawluk agreed with his present medication regimen of Dilantin and Phenobarbital. However, he recommended that Kimmel undergo drug and alcohol counseling. Tr. 249.

A CT of the brain dated June 7, 2006, showed no gross acute intracranial process or skull fracture. Tr. 261. Kimmel was discharged from the hospital to his home the next day. Tr. 266. At the time of discharge medical personnel emphasized to Kimmel the importance of taking his medications and abstaining from the use of alcoholic beverages. Tr. 266.

On June 23, 2006, Kimmel had an appointment with Dr. Chawluk, at which time Kimmel reported that he had not used alcohol since his hospitalization. Tr. 315-316. Kimmel had been taking his medications and had not reported any further seizures. Tr. 315. At this appointment Kimmel did complain of fatigue. A physical examination was essentially normal and revealed that Kimmel was alert and oriented. Tr. 315. Dr. Chawluk's impression was that Kimmel was stable from a seizure standpoint. Tr. 315. Dr. Chawluk made no changes to medication regimen. Tr. 315.

On July 19, 2006, Lynda Graves, M.D., completed a one-page form for the Domestic Relations Section of the Court of Common Pleas of Schuylkill County. Tr. 269. According to this form Dr. Graves first saw Kimmel on June 14, 2006, and last saw

14

him on July 19, 2006.  Tr. 269.  Dr. Graves on the form concluded that Kimmel was unable to work from June 14, 2006, through an unknown date, and that he would be disabled for more than three months because of an uncontrolled seizure disorder.  Tr. 269. There are no examination or treatment notes provided by Dr. Graves.

On September 20, 2006, Kimmel had an appointment with Dr. Chawluk. Dr. Chawluk's physical examination of Kimmel revealed that Kimmel was alert and oriented and all findings were essentially normal. Kimmel did not complain of fatigue or drowsiness and Dr. Chawluk concluded that Kimmel remained stable with regards to his seizure disorder.  Tr. 313.

From June 7, 2006, up until the end of September 2006, Kimmel was free of seizures.  However, on September 30, 2006, Kimmel visited the emergency department at the Good Samaritan Regional Medical Center complaining of seizures.  Tr. 277-281. Kimmel had been drinking alcohol, and had not taken his medications for one week.  Tr. 278 and 281. His blood alcohol level was 283 mg/dL or over 3 times the legal intoxication limit of 80 mg/dL.  Tr. 307.

On November 6, 2006, Kimmel again visited the emergency department of the Good Samaritan Regional Medical Center complaining of seizures.  Tr. 272.  Kimmel had been drinking alcohol and had not taken his seizure medications.  Tr. 272-273. A CT scan of the brain showed no acute cranial or intracranial

findings, and minimal right maxillary sinusitis. Tr. 302. An EKG
showed no evidence of acute abnormalities. Tr. 303. The clinical
impression was that Kimmel was abusing alcohol and noncompliant
with medications. Tr. 274. His blood alcohol level was 249
mg/dL or over 3 times the legal intoxication limit of 80 mg/dL.
Tr. 274.

On December 20, 2006, Kimmel had an appointment with Dr.
Chawluk. Tr. 312. Although Kimmel reported that he was still
getting "occasional" seizures, he did not report that he continued
to drink alcohol and was noncompliant with respect to his
medications. Tr. 272-273 and 312. Dr. Chawluk's physical
examination revealed "an alert male in no apparent distress" and
examination findings were essentially normal. Tr. 312.

On January 24, 2007, Kimmel had an appointment with
Gursharan Singh, M.D., Mahanoy City, Pennsylvania. Tr. 11-13. Dr.
Singh completed a form for the Domestic Relations Section of the
Court of Common Pleas of Schuylkill County. Tr. 13. Although
this was the first appointment Kimmel had with Dr. Singh, on the
form Dr. Singh stated that Kimmel was continuously disabled from
June 2001 through an indefinite date due to an uncontrolled
seizure disorder. Tr. 13 and 319. Dr. Singh's opinion that Kimmel
was continuously disabled since 2001 is not credible because in
2002 Kimmel engaged in substantial gainful work activity and
earned $11,587.64. Also, Dr. Singh only saw Kimmel on three
occasions (January 24, February 28, and March 26, 2007). Tr. 318-

16

320.  Dr. Singh's notes of the last appointment do not make any reference to Kimmel's history of a seizure disorder.  Tr. 318.

On April 25, 2007, Kimmel again visited the emergency department of the Good Samaritan Regional Medical Center complaining of seizures.  Tr. 39.  Kimmel had been drinking alcohol and had not taken his seizure medications.  Tr. 41-42. A CT scan of the brain showed stable appearance of the brain with no intracranial hemorrhage, mass effect or midline shift.  Tr. 47. An EKG showed no evidence of acute abnormalities.  Tr. 44. The clinical impression was that Kimmel was abusing alcohol and had an epileptic seizure.  Tr. 41.  His blood alcohol level was 268 mg/dL or over 3 times the legal intoxication limit of 80 mg/dL. Tr. 45.

Our review of the administrative record reveals that the next seizure episode occurred on August 27, 2007, after Kimmel consumed "a case of beer" and was transported to the emergency department at Good Samaritan Regional Medical Center for treatment.  Tr. 25.[13]  Kimmel had not taken his seizure medications.  Tr. 25.  The clinical impression was that Kimmel was suffering from alcohol intoxication.  Tr. 26.  His blood alcohol level was 208.6 mg/dL or over 2 times the legal intoxication limit of 80 mg/dL. Tr. 26 and 33.

_____

13.  Although some companies distribute cases containing 30 cans per case, generally there are twenty-four 12 or 16 ounce cans of beer in a case.

17

As stated earlier in this order, during the administrative hearing on July 23, 2008, Kimmel claimed that he had not had a seizure for 6 months and that he had not consumed alcohol since October 15, 2007, which was his birthday. Allegedly Kimmel's last seizure occurred sometime in January 2008. There are no medical records relating to that alleged seizure contained within the administrative record. Kimmel also testified that he had six to seven seizures per year prior to January, 2008. However, the medical records do not substantiate six to seven seizure episodes per year. From June 2006 through August of 2007, there is evidence of only 5 dates on which he had seizure episodes.

At the hearing before the administrative judge, John Menio, M.D., testified as a medical expert. Tr. 90. Dr. Menio testified that alcohol lowers the threshold for seizure activity and alters anti-seizure medications. Tr. 106. He also testified that alcohol can precipitate seizures, and that Kimmel's alcohol abuse was a substantial factor contributing to his seizure disorder. With respect to the side effects of the medications which Kimmel is taking, Dr. Menio stated that Dilantin is not very sedating. Dr. Menio testified that Kimmel could perform light work involving moderate activity as long as he avoided machinery, heights and dangerous situations. He further testified that Kimmel could lift and carry at least 20 pounds on a regular basis. Tr. 113-114.

David Weinberger, Ph.D., a licensed clinical psychologist, also testified as an expert. Dr. Weinberger testified that there was no indication in the record that Kimmel had a psychiatric impairment that met or equaled a listed impairment. Tr. 113 and 146. Dr. Weinberger also testified that there was nothing in Kimmel's record pointing to depression as a primary diagnosis that would be disabling. Tr. 112.

In April of 2007, a Psychiatric Review Technique form was completed regarding Kimmel by Karen Weitzner, Ph.D., a psychological consultant working on behalf of the Social Security Administration. Tr. 322-324. Dr. Weitzner concluded that Kimmel had an anxiety-related disorder that was not "severe" as it resulted in no restriction of activities of daily living, mild difficulties maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation of an extended duration. Tr. 322, 327 and 332. Dr. Weitzner noted that Kimmel had been prescribed medication, reportedly for an anxiety disorder, but that there was no evidence of current psychiatric treatment. Tr. 334.

On April 19, 2007, Jay Shaw, M.D., a medical consultant, performed a residual functional capacity assessment based upon his review of the written records. Tr. 335-340. Dr. Shaw concluded that Kimmel could perform a limited range of medium work and that the medical evidence did not support the alleged severity or

frequency of the seizures or side effects of medications. Tr. 336-340.

On April 29, 2008, Richard H. Blum, M.D., a board certified internist, completed a set of interrogatories. Tr. 341-343 and 350. Dr. Blum stated that Kimmel had chronic alcoholism, and a seizure disorder because of alcohol abuse or failure to take his medications. Tr. 341. Dr. Blum was of the opinion that Kimmel's seizures did not meet or equal a listing because they could be controlled with medication and by refraining from using alcohol. Tr. 342. Dr. Blum found that Kimmel could perform a limited range of light work. Tr. 344-348.

Kimmel completed a document entitled "Function Report – Adult" which purports to set forth his functional limitation resulting from the side-effects of his medications. In sum the report states that he takes his medications, sleeps most of each day, does not engage in any household activities (including cooking or cleaning), and rarely leaves the home. Tr. 187-194. Kimmel's wife Lena also completed a document entitled "Function Report Adult (Third Party)" which mirrors the document completed by her husband. Tr. 179-186. In fact it appears that the handwriting on both documents is the same.

We will now consider Kimmel's arguments. Kimmel argues that the administrative law judge erred in the following three respects: (1) the administrative law judge erred at step three of the sequential evaluation process when he found that Kimmel's impairments did not meet or medically equal one of the listed

impairments, (2) he erred in the manner in which he evaluated the medical evidence, and (3) he erred in the manner in which he evaluated Kimmel's subjective complaints. We have thoroughly reviewed the record in this case and find no merit whatsoever in those arguments.

At step two the administrative law judge found that Kimmel suffered from a severe impairment. If Kimmel's severe impairments met or equaled a listed impairment, he would have been considered disabled per se and awarded disability benefits. However, a claimant has the burden of proving that his or her severe impairment or impairments meet or equal a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 530 (1990). To do this a claimant must show that all of the criteria for a listing are met Id. An impairment that meets only some of the criteria for a listed impairment is not sufficient. Id.

The administrative law judge concluded that Kimmel did not have an impairment or combination of impairments which meet or equal any of the listed impairments in 20 C.F.R. pt. 404, subpart P, app. 1. Kimmel specifically argues that the listing which the administrative law judge should have found that he met was 11.02A. In order to meet Listing 11.02A, Kimmel must demonstrate:

> 11.02 Epilepsy--convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; **occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.**
>
> With: A. Daytime episodes (loss of consciousness and convulsive seizures) . . . .

21

(Emphasis added.) We are satisfied that substantial evidence supports the administrative law judge's conclusion that the criteria for listing 11.02A were not met. The medical evidence does not establish that Kimmel had seizures "occurring more frequently than once a month." The evidence only shows five seizure episodes in approximately a 14 month period and were at times when Kimmel was not taking his medications.

The administrative law judge appropriately considered the medical evidence. That evidence shows that Kimmel did not meet Listing 11.02A. Furthermore, the administrative law judge appropriately relied on the testimony of Dr. Menio and Dr. Weinberger, as outlined above, in finding that Kimmel could engage in sedentary work. The evaluations of Drs. Blum, Shaw and Weitzner, also support the administrative law judge's findings.

The administrative law judge found that Kimmel's subjective complaints relating to functional limitations were not entirely credible. The administrative law judge when addressing the issue of Kimmel's residual functional capacity stated as follows:

> Mr. Kimmel testified he cannot work because of anxiety and all the medications he takes. He stated he has six or seven seizures a year. The claimant stated that his medication controls his seizures; but, he is very tired. He testified he sleeps from ten o'clock at night until four o'clock in the afternoon. The claimant stated he has anxiety and depression because he cannot do anything to help around the house. He testified that he feels lost and helpless and gets anxiety attacks when he goes to the mall and the grocery store. Mr. Kimmel stated that he gets periods of dizziness when he turns his head or

22

> bends down. He testified he takes Celexa and Dilantin.
> . . . the claimant's statements concerning the
> intensity, persistence and limiting effects of these
> symptoms are not credible to the extent they are
> inconsistent with the residual functional capacity
> assessment [of sedentary work]. . . .
>
> The claimant alleged disability due to mental
> impairments; but, he has not sought any mental health
> treatment other than taking medication prescribed by
> his family doctor. There is no objective medical
> evidence of any medical treatment after March 2007 and
> the objective medical evidence available prior to that
> date does not document six or seven seizures a year,
> despite the claimant taking his medication properly.
> Rather, the claimant has seizures when he failed to
> take his medication and when he abused alcohol . . . .

Tr. 72-73. Those finding are supported by substantial evidence.

None of Kimmel's treating or examining physician's found that he had "functional limitations" which would preclude him from working. Dr. Shaw found that Kimmel could perform medium work and Dr. Blum found that Kimmel could perform light work. The clinical findings of Dr. Chawluk do not support Kimmel's claims of functional limitations. When examined by Dr. Chawluk on June 23, 2006, Kimmel was alert and oriented when taking his seizure medication as prescribed. On August 7, 2006, Dr. Chawluk adjusted Kimmel's medication because he was complaining of mood swings; Kimmel did not complain of drowsiness or fatigue. When Dr. Chawluk saw Kimmel on September 20, 2006, Kimmel again did not complain of drowsiness or fatigue. The limited notes of Dr. Singh also show that Kimmel did not complain of fatigue. Neither Kimmel's testimony nor his wife's written statement in which they claim disabling side-effects from medications is supported by the

medical records.  Because the lay statements concerning Kimmel's fatigue were not substantiated by the medical records, the administrative law judge had the discretion to find that Kimmel lacked credibility with respect to his claims of functional limitations resulting from his medications.  Furthermore, the Court of Appeals for this circuit has stated that "[d]rowsiness often accompanies the taking of medications, and that it should not be viewed as disabling unless the record references serious functional limitations."  Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002). In this case, the medical records do not reference any serious functional limitations associated with Kimmel's medications.

        We find no fault with the administrative law judge's conclusion that Kimmel could engage in sedentary work with the limitations noted in his decision.  Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner denying Kimmel disability insurance and supplemental security income benefits.

        NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

        1.  The Clerk of Court shall enter judgment in favor of the Commissioner and against Craig A. Kimmel as set forth in the following paragraph.

2.  The decision of the Commissioner of Social Security denying Craig A. Kimmel social security disability insurance and supplemental security income benefits is affirmed.

3.  The Clerk of Court shall close this case.


s/Malcolm Muir
MUIR
United States District Judge

MM:gs